**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 93-3178

---

United States of America,

Plaintiff-Appellee,

VERSUS

Walter Wallace, Michael Felton, and Murray Sutton,

Defendants-Appellants.

---

Appeal from the United States District Court
for the Eastern District of Louisiana

---

(September 8, 1994)

Before REYNALDO G. GARZA, DeMOSS and PARKER[*], Circuit Judges.

DeMOSS, Circuit Judge:

Defendant-appellants Michael Felton, Walter Wallace and Murray Sutton were convicted by a jury on December 15, 1992 of (1) possession of counterfeited Federal Reserve notes, and (2) conspiracy to possess and pass counterfeited notes.[2] The jury

---

[*]In June 1994, when oral arguments were heard in this appeal, Judge Robert M. Parker was chief judge of the Eastern District of Texas, sitting on the appellate panel by designation. As of the date of this opinion, Judge Parker has been confirmed as a judge on the United States Court of Appeals for the Fifth Circuit.

[2]"Whoever, with intent to defraud, passes ... or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or

also convicted Felton of conspiracy to possess marijuana with the intent to distribute under 21 U.S.C. §§ 841(a)(1) and 846.

Felton, Wallace and Murray appeal their convictions and sentences, raising various claims of error.[3] We AFFIRM the convictions of all three appellants. We AFFIRM the sentences of Wallace and Sutton, but we VACATE Felton's sentence and REMAND the case for re-sentencing of Felton.

FACTS

Because none of the appellants challenges the sufficiency of the evidence to support his conviction on any count, our factual discussion will be brief. The government proved, through testimony of co-conspirator Doug Friday and other corroborating evidence, that in 1991 and 1992 Friday and Felton made several trips from New Orleans to the border town of Roma, Texas, to obtain marijuana and bring it back to New Orleans to be sold.

The government also proved, through Friday's testimony and other corroborating evidence, that in 1991 and 1992 Friday, Felton, Collins, Wallace and Sutton made plans to print and distribute counterfeit bills using defendant Wallace's print shop, Tiger Press, in New Orleans.[4] The government's investigation was aided by

both." 18 U.S.C. § 472. See also 18 U.S.C. 371 (conspiracy).

[3]Co-conspirator Leslie Collins was also convicted of conspiracy and possession of counterfeited notes, but does not appeal. Another co-conspirator, Douglas Friday, pleaded guilty and testified for the government at trial pursuant to a plea agreement.

[4]Wallace and Collins had both recently finished serving their federal sentences for a previous counterfeiting conspiracy which occurred in 1989. In the 1989 conspiracy, a different print

2

a paid confidential informant who accompanied the conspirators in their counterfeiting activity, and by surveillance of the residences of Felton and Friday. A warrant search of Friday's residence on January 23, 1992 resulted in the seizure of a paper cutter, paper trimmings, latex gloves and more than $99,000 in counterfeit notes. Appellants Wallace, Felton and Sutton appeal their convictions and sentences, raising several arguments for reversal.

## DISCUSSION

### *Batson* Challenge to Peremptory Strikes

During jury selection, the government used six of its nine peremptory strikes to exclude black panel members from the jury. The government's other three strikes were against white panel members. The defendants objected pursuant to Batson v. Kentucky, 476 U.S. 79, 86 (1986)(holding that Equal Protection Clause forbids litigants from exercising peremptory strikes on the basis of race).

A Batson challenge has three steps: (1) The defendant establishes a prima facie case by raising an inference that the prosecution struck potential jurors solely because of race. Batson, 476 U.S. at 96-97; (2) The burden then shifts to the prosecution to articulate legitimate, clear, and reasonably specific explanations for each of the challenged strikes. At this stage, the prosecution need only give a facially valid explanation. United States v. Bentley-Smith, 2 F.3d 1368, 1373 (5th Cir. 1993); (3) At the third

---

shop, also owned by Wallace, had been used to print the money. Evidence of the 1989 conspiracy was introduced at trial to show intent, knowledge and plan.

3

stage, the trial court determines whether the defendant has proven purposeful discrimination. Bentley-Smith, 2 F.3d at 1373. The appellate court reviews this finding for clear error, giving great deference to the trial court's finding that the prosecutor's explanation was credible. Id. at 1374; United States v. Terrazas Carrasco, 861 F.2d 93, 94 (5th Cir. 1988).

Defendants' challenge concerns the third step of the Batson analysis -- they claim that the trial court clearly erred in finding that the prosecution's reasons for striking the black panel members were race-neutral and not a pretext for purposeful discrimination. The government gave these reasons for its strikes:

(1) one black man was struck because he kept his hat on in court even though the marshal had asked another person to remove his hat; the prosecutor thought this showed a lack of respect for authority.

(2) a black female security officer employed by the New Orleans Police Department was struck because one of the prosecutors had in the past prosecuted several N.O.P.D. police officers and "although she may not know me, I don't want her to hold it against me."

(3) a black woman was struck because she was retired and "seemed very feeble and somewhat old," and the prosecutor didn't think she could "hold her own in jury deliberation."

(4) one black panel member was struck because she was a social worker and had been the victim of two car thefts. (the government believes social workers tend to sympathize with criminal defendants, and an important government witness, Douglas Friday, was a two-time convicted car thief).

(5) one black panel member was struck because she had an ongoing tax dispute with the federal government and had once been represented by Felton's trial counsel. In addition, she was employed as a social worker.

(6) the last excluded black panel member was also a social worker.

Defendants argue that the government's reasons are flimsy and pretextual, and that the trial court clearly erred because it made

4

no specific credibility findings, but merely listened to the government's race-neutral reasons and stated that "I don't see any racial problem" with the jury.

We find no basis for reversal. Jury selection is inherently subjective, and <u>Batson</u> determinations largely turn on the trial court's "evaluation of [the] credibility of counsel's explanation," <u>Bentley-Smith</u>, 2 F.3d at 1374. We hold that the trial court did not clearly err in accepting the prosecution's race-neutral reasons.[5]

## Limits on Cross-Examination

Defendants complain that the trial court violated their rights under the Confrontation Clause of the Sixth Amendment when it "severely limited" their cross-examination of Douglas Friday, a co-conspirator who testified for the government pursuant to a plea agreement. Defense lawyers questioned Friday regarding (1) his understanding of his plea agreement with the government and his reasons for entering into it; (2) the possible sentence he thought

---

[5]We note in passing that government attorneys also objected under <u>Batson</u>; the three defendants, all of whom were black, used all 13 of their strikes against white panel members. The reasons articulated by defense counsel for their strikes were largely based on occupation, age and similar characteristics, although several white panel members were eliminated "as a group decision amongst defense counsel because there were more qualified white representatives further down." The record indicates that 20 percent of the original panel members were black and 80 percent were white. After several jurors were excused by the court for cause, the panel was 18 percent black and 82 percent white. After denying both <u>Batson</u> motions, the court commented: "It seems to me that we have ended up with a very responsible group of citizens who are not tilted one way or another as far as race goes." The record does not show the racial composition of the chosen jury, and none of the parties to this appeal have provided this information to the court, although it might have given a clue as to the government's intent for their peremptory strikes.

he could receive; (3) whether he feared his girlfriend might be prosecuted; and (4) whether he feared prosecution by state authorities in Louisiana or Texas. The court ruled repeatedly that many of these questions called for legal conclusions and were improper, and told Friday not to answer.

We have held that restrictions on the scope of cross-examination rest within the sound discretion of the trial judge. See, e.g., United States v. Summers, 598 F.2d 450, 460 (5th Cir. 1979). In addition, a defendant's Sixth Amendment rights do not "guarantee cross-examination that is effective in whatever way and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985). Our examination of the record shows that Friday was fully cross-examined on all the subjects about which defendants complain. We hold that it was within the trial court's discretion to limit repetitive or improper cross-examination. See United States v. Beros, 833 F.2d 455, 465 (3rd Cir. 1987)(upholding limits on "repetitive" and "marginally relevant" cross-examination into bias of government witness).

## "Prosecutorial Misconduct"

For prosecutorial misconduct to warrant a new trial, it "must be so pronounced and persistent that it permeates the entire atmosphere of the trial," United States v. Stewart, 879 F.2d 1268, 1271 (5th Cir.), cert. denied, 493 U.S. 899 (1989), and "casts serious doubt upon the correctness of the jury's verdict," United States v. Carter, 953 F.2d 1449, 1457 (5th Cir.), cert. denied, 112 S.Ct. 2980 (1992). Defendants Murray and Felton argue that

6

prosecutors (1) improperly vouched for their own witness's credibility by introducing Friday's plea agreement and questioning him in detail on its terms; (2) made an improper statement in front of jurors that revealed that the defendants were incarcerated, and (3) asked several questions about a statement from a document that had not been admitted into evidence.

We first note that a prosecutor may properly bring out the terms of a plea agreement on direct examination. United States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991). Regarding the prosecutor's statement which revealed that the defendants were incarcerated, we hold that the remark, even if improper, did not cast doubt on the correctness of the verdict. The record shows that while the jury was filing out of the courtroom for a recess, Felton's counsel made a request to the court that Doug Friday and another potential government witness, Steven Miller, be kept separated from one another during the break. The prosecutor, noting that the courthouse had only two holding cells, responded that the only alternative was to place one of the witnesses "in with the defendants." It is unlikely that any of the jurors heard this statement, and in any case the evidence of guilt was sufficient such that the jurors' knowledge that the defendants were incarcerated does not cast serious doubt upon the correctness of the verdict. Regarding the prosecutor's questions relating to the letter not in evidence, the record shows that the prosecutor was attempting to question the witness about the words "Doug Friday's a rat," that were written on the wall of the courthouse holding

7

cell, _not_ about the letter, although the letter also mentioned the words on the wall. In any case, the court sustained the defense objections, and the question was never answered. We hold that these three minor incidents were not enough to cast doubt on the correctness of the verdict, and a new trial is not warranted.

### Mention of Polygraph Test

During cross-examination, government witness Friday stated:

> "If you are interested in my credibility -- you wanted to see my PSI report earlier -- I will be more than happy to submit my PSI report and a lie detector test if your co-defendants will do the same."

Defense counsel immediately requested a bench conference and moved for a mistrial. The trial court denied the mistrial, but allowed counsel to jointly draft a curative instruction acceptable to both prosecution and defense, which the court read to the jury:

> "The witness's last statement was non-responsive, inappropriate and should be stricken from the record. Polygraph examinations are not admissible in this or any court by any party. The witness's statement must not be considered by you in any way during your deliberations. Even if the parties agreed to take such a test, the results would not be admissible before the Court."

The judge then admonished the witness Friday, in the presence of the jury, to "just answer the attorney's questions. Don't volunteer." Although they concede that the government had nothing to do with the witness's outburst, the defendants argue that this incident so prejudiced them that they are entitled to a new trial. We disagree, and hold that any prejudice was cured by the court's instruction. _See_ _United States v. Martino_, 648 F.2d 367, 390-91

8

(5th Cir. 1981)(any prejudice caused by witness's unsolicited reference to polygraph cured by instruction to disregard), <u>vacated in part on other grounds</u>, 650 F.2d 651 (5th Cir. 1981), <u>cert. denied</u>, 456 U.S. 949 (1982).

<u>Issue 5: Wallace's Prior Conviction</u>

Appellant Wallace argues that the trial court violated Federal Rule of Evidence 404(b)[6] by improperly admitting evidence of his prior counterfeiting conspiracy and conviction with co-defendant Leslie Collins. The government called three witnesses to testify about the 1989 former counterfeiting conspiracy, and their testimony covered 38 pages of the 1,200-page trial transcript.

Wallace claims that the evidence of his extrinsic offense was admitted to show bad character, which is prohibited, rather than to prove intent, plan, motive, identity or lack of knowledge, which is permitted under Rule 404(b). Wallace claims that the unfair prejudice to him caused by the detailed testimony of his prior offense substantially outweighed any proper probative value. He points out that he was willing at trial to stipulate to the prior conviction in order to limit the prejudicial relating of the details.

A district court's decision to admit evidence is reviewed under an abuse of discretion standard. <u>See</u>, <u>e.g.</u>, <u>United States v.</u>

---

[6]"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED.R.EVID. 404(b).

9

Maggitt, 784 F.2d 590, 597 (5th Cir. 1986). We will give great deference to the district court's informed judgment in making the balancing decision required by Rule 404. United States v. Moye, 951 F.2d 59, 61-62 (5th Cir. 1992). In this case, the evidence of Collins' and Wallace's 1989 conspiracy, in which they manufactured $20 counterfeit notes at Wallace's print shop and distributed them, was probative on the issues of intent, knowledge and plan.[7] In addition, as the trial court noted, the factual similarity and closeness in time between the two conspiracies increased the probative value of the evidence. See Moye, 951 F.2d at 62. We also note that the amount of testimony about the prior conspiracy was brief when compared to the whole trial, and the jury was properly instructed that the testimony could only be considered on the listed issues. We will not disturb the trial court's decision to admit the evidence.

### "Improper Comments" by Trial Court

Defendants Wallace and Felton argue that the trial court prejudiced them with improper comments during the seven-day trial, including (1) "bolstering the government witness's credibility"; (2) repeating an unresponsive comment by a DEA agent that the confidential informant was "being paid to risk his life"; (3)

---

[7]The government's closing argument emphasized expert testimony that the bills from the 1989 conspiracy had several identifiable flaws that did not appear in the bills from the instant conspiracy, although the production methods were similar. The government suggested that Wallace, who owned a print shop and already knew how to print counterfeit money, had learned how to print a better counterfeit bill by listening to the expert testimony in his first trial.

stating that the defense could call the DEA agent as a witness, thus implying that a criminal defendant has an obligation to put on evidence; (4) answering a question posed to a witness; and (5) stating in front of the jury that defense motions for a mistrial were "frivolous."

A federal district judge may comment on the evidence, question witnesses, bring out facts not yet adduced, and maintain the pace of the trial by interrupting or setting time limits on counsel. United States v. Hawkins, 661 F.2d 436, 450 (5th Cir. 1981), cert. denied sub. nom., Valdes v. United States, 459 U.S. 832 (1982). "Improper" comments by a trial judge do not entitle the defendant to a new trial unless the comments are error that is substantial and prejudicial to the defendant's case. Ruiz v. Estelle, 679 F.2d 1115, 1129 (5th Cir.), cert. denied, 460 U.S. 1042 (1982). In reviewing this issue, we must view the record as a whole rather than viewing individual incidents in isolation. United States v. Jacquillon, 469 F.2d 380, 387-88 & n.1 (5th Cir. 1972), cert. denied, 410 U.S. 938 (1973).

This was a hotly contested trial, and outbursts of temper from the attorneys and witnesses were frequent. We have examined the entire trial transcript, putting into context the comments about which appellants complain. We also noted similar comments from the bench that arguably benefitted the defense. We hold that any error committed by the court by these comments did not substantially prejudice the defense, and in any case, was cured by the court's instruction to the jury to disregard any such comments.

<u>Quashing of Subpoenas</u>

At trial, the government rested its case without having called two of the witnesses that had been listed on its prospective witness list, DEA Agent John Houston and U.S. Border Patrol Agent William Rasbury. This action surprised the defendants, because Houston and Rasbury were on a list read to the jury as "witnesses that the government may use," and the government had already produced Jencks Act[8] material in anticipation of their possible testimony. Houston and Rasbury were present in the hallway on the last day of the government's case, and counsel for Wallace had spoken to them about their anticipated testimony. After the government rested without calling Houston or Rasbury, defendants attempted that evening to subpoena the two agents to testify for the defense. However, the trial court granted the government's motion to quash the subpoenas because defendants had not complied with the procedure set forth in 28 C.F.R. § 16.21 <u>et</u>. <u>seq</u>., regulating the issuance of subpoenas to Department of Justice employees.[9] The trial court stated that defense counsel should have known that the government, for trial strategy reasons, might not call all of its listed witnesses. If the defense wanted to be certain that the agents would be available to testify, the court

_____

[8]18 U.S.C. § 3500.

[9]"If oral testimony is sought by a demand in a case or matter in which the United States is a party, an affidavit, or, if that is not feasible, a statement by the party or by the party's attorney setting forth a summary of the testimony sought must be furnished to the Department attorney handling the matter." 28 CFR § 15.23(c).

12

stated, then the defense should have subpoenaed the agents in advance and followed the applicable regulations:

> "There's a lot of work that should have been done ahead of time. This is a last-minute effort here, and I am not going to let the case languish here while we have some extra motions that nobody even contemplated."

The court also expressed concern about the growing length of the trial, which was already in its fifth day despite the attorneys' original estimate of a two-day trial.

The defendants contend that the trial court's quashing of the subpoenas denied them a fair trial and the right to present evidence on their behalf and compel witnesses to testify. We disagree. The Department of Justice regulations for subpoenaing witnesses have been held to be valid and mandatory. United States v. Allen, 554 F.2d 398, 406 (10th Cir.), cert. denied, 434 U.S. 836 (1977). Because the defendants failed to make a timely demand in accordance with the required procedure set out in 28 C.F.R. § 16.23(c), we do not reach their constitutional claims. United States v. Marino, 658 F.2d 1120, 1125 (6th Cir. 1981).

We additionally note that the necessity or value of the two agents' testimony was questionable. We have reviewed defense counsel's proffer of what testimony they would have elicited from Houston and Rasbury, and we are satisfied the issues involving the agents were adequately brought out by other testimony.[10] Therefore,

_____

[10]Agent Houston had interrogated Steve Miller, the brother of government witness Doug Friday. In Agent Houston's official report, Miller made statements about Friday's counterfeiting and marijuana activities that defense counsel wanted to use to

13

we hold in the alternative that the exclusion of the two witnesses may be upheld under the trial court's power to control the trial and limit testimony that would be cumulative and marginally relevant.

> "Like many other constitutional rights, the right to call witnesses is not absolute. The right to present relevant testimony may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. ... The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm rules relating to the presentation of evidence. ... The right of compulsory process does not, therefore, entitle a defendant to subpoena witnesses whose testimony would be collateral, rather than material, to the issues in the case. If the court could properly have excluded proffered testimony on the ground that the evidence was collateral, its refusal to subpoena witnesses who were to give that testimony cannot be deemed error."

United States v. Bertoli, 854 F. Supp. 975, 1081-82 (D.N.J. 1994)(citations omitted); see also United States v. Campbell, 874 F.2d 838, 850-51 (1st Cir.1989)(no error in quashing of subpoena of government informant where "his testimony could add nothing relevant and material to [the] defense"). For these reasons, we

---

impeach Friday's testimony about the defendants. In addition, Miller had accompanied Friday and Felton on at least one of their trips to Roma, Texas to obtain marijuana. Miller was caught on a bus carrying a duffel bag of marijuana and was arrested by Agent Rasbury, a border patrol officer. Felton's counsel wanted to use Agent Rasbury's testimony on Miller's arrest and Agent Houston's testimony about the interview with Miller to point out minor inconsistencies with Friday's testimony and thus imply that Friday was lying about Felton's involvement in the drug trafficking. Although the trial court quashed the defense subpoenas for the two agents, defense counsel called Steve Miller to the stand to testify about these issues and used Houston's report to cross-examine Miller.

hold that the trial court did not err in quashing the subpoenas.

Jencks Act Issues

A. Friday's PSI

During the testimony of government witness/co-conspirator Douglas Friday, defendants requested that the government produce Friday's presentence investigation report pursuant to the Jencks Act.[11] Defendants also argue that the PSI "version of events" was potentially exculpatory because of its impeachment value, and thus also should have been turned over under Brady v. Maryland, 373 U.S. 83, 86 (1963).

The Fifth Circuit has held that a PSI is not an Jencks Act statement. United States v. Jackson, 978 F.2d 903, 909 (5th Cir. 1992). cert. denied, 113 S.Ct. 2429 (1993). Even if Friday had "adopted" his PSI by failing to object to it, such adoption is very different from the "adoption" required to make the report Friday's own statement under the Jencks Act. See Jackson, 978 F.2d at 909. With regard to the defendants' Brady request, the trial court examined the PSI version of events and found that it did not contain any material differences from Friday's testimony and therefore would not be useful for impeachment, or "favorable to the defense" under Brady. The district court thus fulfilled its duty and afforded the defendants all the rights to which they were entitled. See Jackson, 978 F.2d at 909. We find no reversible

_____

[11]The Jencks Act provides: "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500.

16

error.

## B. Notes of Agent Billiot

The government called DEA Special Agent Keith Billiot to testify regarding his execution of a search warrant on Friday's car and the resulting seizure of evidence, and a confession given by Felton after he was arrested. Defendants requested that the government produce Agent Billiot's notes and reports under Brady and the Jencks Act. The government turned over Billiot's memoranda concerning the search warrant and the confession, but the court denied the motion as to the remainder of the agent's notes, relying on United States v. Gaston, 608 F.2d 607, 611-12 (5th Cir. 1979). In Gaston we held that interview reports prepared by agents are Jencks Act material only to the extent that they relate to the subject matter of the agent's direct testimony. The district court found that Agent Billiot's notes did not relate to the limited facts to which he testified. We find no clear error in the district court's finding that the government was not required to produce the notes under the Jencks Act.

## Ineffective Assistance of Counsel

Defendant Felton argues that his attorney provided ineffective assistance at trial because he failed to follow the correct procedures to subpoena Agents Houston and Rasbury. Defendant Sutton lists numerous reasons why his trial counsel was ineffective, also adopting Felton's argument regarding the subpoenas.

We conclude that this case is appropriate for application of the general Fifth Circuit rule that such claims cannot be resolved

on direct appeal unless adequately raised in the district court. United States v. McCaskey, 9 F.3d 368, 380 (5th Cir. 1993), cert. denied, 114 S. Ct. 1565 (1994). Although the issue of ineffective assistance was at least mentioned at trial,[12] we hold that the record is not sufficiently developed with respect to these ineffective assistance claims to justify an exception to the general rule of non-review. See United States v. Bermea, ___ F.3d ___, No. 92-7349, 1994 WL 459951 at *36-37 & n.4 (5th Cir. Aug. 25, 1994). Felton and Sutton remain free to pursue their claims of ineffective assistance in accordance with 28 U.S.C. § 2255.

### Felton's Sentence

Appellant Felton was sentenced to a total of 262 months on all counts. The district court found Felton to be a career offender under U.S.S.G. § 4B1.1. Felton argues that this determination was error, because § 4B1.1 requires that the current offense be a "controlled substance offense," and he was merely convicted of conspiracy to possess marijuana, rather than of the substantive offense of possession. Felton asserts that drug conspiracies are not included in the list of "controlled substance offenses" in 28 U.S.C. § 994(h), from which the Sentencing Commission drew its authority to punish career offenders. Therefore, he argues, the

---

[12]Felton's trial counsel made a brief statement regarding ineffective assistance during arguments over the quashed subpoenas. Sutton approached the court on the fourth day of trial and stated that he no longer wanted his current lawyer to represent him and that he needed adequate representation by "someone who's not going to take everything that I say and bring it to the prosecutor." The court said that Sutton had made his decision about representation before trial and that he had not given a sufficient reason to change attorneys midstream.

18

Sentencing Commission exceeded its statutory authority in Application Note 1 to U.S.S.G. § 4B1.2, when it defined "controlled substance offense" to include a conspiracies to commit such offenses. <u>See</u>, <u>e.g.</u>, <u>United States v. Price</u>, 990 F.2d 1367, 1370 (D.C. Cir. 1993).

Felton's argument has merit. A recent Fifth Circuit opinion vacated a sentence on the same basis. <u>United States v. Bellazerius</u>, 24 F.3d 698, 705 (5th Cir. 1994). In light of <u>Bellazerius</u>, we vacate Felton's sentence and remand his case for re-sentencing.[13]

## Sutton's Sentence

Appellant Sutton received 60-month and 120-month sentences on the two counterfeiting counts, to run concurrently with each other and with a separate sentence imposed in a related case by another federal district judge a month earlier for conspiracy, possession/passing of counterfeit notes, and being a felon in possession of a firearm, all in connection with his arrest on March 8, 1992. Sutton argues that the district court improperly grouped the conviction counts in both cases together, and improperly used Sutton's possession of a firearm in one case to enhance his sentence in the other.

Sutton's possession of a firearm in his truck with the counterfeit bills was properly included as relevant offense conduct in either of the two related counterfeiting conspiracies. The

---

[13]Because we vacate Felton's sentence, we do not address his two additional sentencing issues. However, we note that both of the findings he contests -- the drug quantity and the obstruction-of-justice enhancement -- will not be vacated absent clear error by the trial court.

indictment under which Sutton was convicted in the instant case explicitly charges that Sutton's actions on March 8, 1992 constituted an overt act in furtherance of the conspiracy. The firearm would thus be relevant conduct even if Sutton had not been convicted of "felon-in-possession," or even if the convictions in the two cases had not been grouped together. Therefore, the grouping of the counts made no difference in the length of the sentence Sutton now appeals, and the inclusion of the firearm as relevant conduct was not error.

## CONCLUSION

Therefore, for the reasons stated in this opinion, we AFFIRM the convictions of all three defendants. We AFFIRM the sentences of Wallace and Sutton, and we VACATE Felton's sentence and REMAND the case for re-sentencing of Felton.