**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 94-10185

UNITED STATES OF AMERICA

Plaintiff-Appellee,

VERSUS

RAY CHARLES FIELDS, a/k/a "RC", "Big Daddy", TIMOTHY
FIELDS, TED ROSS, DARRON FIELDS, CLYDE MCDONALD, a/k/a "Polo",
and TERRY RICHARDSON, a/k/a "Freeze",

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Texas,

January 9, 1996

Before REYNALDO G. GARZA, JOLLY & DUHÉ, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

I.

BACKGROUND

Appellants were convicted of multiple offenses arising out a
conspiracy that operated a crack cocaine distribution ring in
Dallas, Texas.  According to the evidence most favorable to the
government, the ring, known as the Fields organization, was headed

by Ray Charles Fields ("Ray Fields").  His Brothers, Timothy and Darron Fields, helped him run the operation.  The Fields organization would buy large amounts of powder cocaine, turn it into crack cocaine, distribute it to salespersons at various sites, and then pick up the money from the salespersons.

Defendant Ted Ross ("Ross") ran two of the Fields organization's crack cocaine distribution sites.  One was located on Rupert Street and the other at a car wash.  Clyde McDonald ran drugs to various locations.  Terry Richardson ("Richardson") delivered money from the distribution sites to a game room, where the money was collected and employees were paid.

The Fields organization distributed more than 1,000 kilograms of crack cocaine before it was broken up by law enforcement.  The defendants were then tried and convicted of various offenses arising out of their involvement in Fields organization.  They now appeal from those convictions on various grounds.


II.

THE DEFENDANTS' *BATSON* CLAIM

The prosecution exercised four of its preemptory strikes against minority venirepersons.  Three were exercised against blacks, and the fourth against a hispanic.  The defendants concede that the prosecution gave race-neutral reasons for excusing three of the minority venirepersons.  But all the defendants, except for Richardson, claim that the prosecution exercised its preemptory strike against the fourth, a black female, on the basis of race.

2

The prosecution contends that it had race-neutral reasons for striking that venireperson.  Specifically, she was young, which made her more likely to identify with the defendants, she avoided eye contact with the prosecutor, and she looked at the defendants in a flirtatious manner.

The Supreme Court has set up a three-step process for examining objections to preemptory challenges on the grounds of race.[1]  First, a defendant must make a prima facie showing that the prosecutor has exercised a preemptory challenge on the basis of race.[2]  Second, if the defendant makes such a prima facie showing, the burden shifts to the prosecutor to articulate a race-neutral reason for excusing the juror in question.[3]  Third, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.[4]

The Supreme Court stated that a race-neutral explanation is an explanation based upon something other than the race of the juror.[5]  Such an inquiry should focus upon the facial validity of the prosecutor's explanation.[6]  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason given by the

[1]Such challenges are known as *Batson* challenges.  *See* Batson v. Kentucky, 476 U.S. 79 (1986).

[2]Hernandez v. New York, 111 S. Ct. 1859 (1991).

[3]*Id.*

[4]*Id.*

[5]*Id.*

[6]*Id.*

prosecution will be deemed race-neutral.[7]  Further, this circuit has recognized that "a prosecutor's explanation for a peremptory strike need not rise to the level of a challenge for cause; it merely must contain a clear and reasonably specific articulation of legitimate reasons for change."[8]  We review the district court's determination that the prosecution gave a race-neutral explanation for clear error.[9]

Two of the reasons given by the prosecution, the juror's avoidance of eye contact and the juror's age, have been upheld as valid race-neutral reasons by this circuit.[10]  The third reason, looking flirtatiously at the defendants, has not previously been passed upon by this circuit.  However, we find it to be equally race-neutral.  Therefore, we hold that the district court did not err in finding that the prosecution gave race-neutral explanations for excluding the juror.

## III.

### REFERRAL TO COMMUNITY EXPECTATIONS DURING CLOSING ARGUMENT

All of the defendants, except Richardson, argue that the following portion of the prosecution's closing argument was

---

[7]*Id.*

[8]United States v. Clemons, 941 U.S. 321, 325 (5th Cir. 1991).

[9]United States v. Seals, 987 F.2d 1102, 1109 (5th Cir.), *cert. denied*, 114 S. Ct. 115 (1993); Polk v. Dixie Ins. Co., 972 F.2d 83, 85 (5th Cir. 1992), *cert. denied*, 113 S. Ct. 982 (1993).

[10]*Polk*, 972 F.2d at 86 (eye contact); United States v. Terrazas-Carrasco, 861 F.2d 93, 94-95 (5th Cir. 1988)(age, eye contact and body language); *Clemons*, 941 F.2d at 325 (age);

4

improper:

> Now, when you convict these defendants, and I think you will because the evidence supports it, all of them, you are not going to stop that problem out there. I don't expect that and you don't expect that. But you know who is going to be glad about that? The neighbors, the high school down the street from Gabriel Gardens Apartments, the business around the corner —
>
> [Defense Counsel] Your honor, I object to reference to community expectations on a particular verdict.
>
> [The Court] Overrule the objection.
>
> [The Prosecutor] The businesses down the street from other Oak Cliff areas, the church down the block from the Metropolitan Apartments. Those are the people that are going to be happy, they will be satisfied, they will know that what's going on down here is the right thing.
>
> It's a neighborhood problem. If we take neighborhoods back by putting these people in jail, we can eventually work our way to solving this problem. But it's got to start right here.

The defendants claim that this argument was an impermissible appeal to the passion and prejudice of the jury. They claim that the prosecution urged the jury to lay the blame for the drug problem on the feet of the defendants, and to end a societal problem by convicting the defendants. They further argue that the argument pressured the jurors to convict by suggesting that the communities most affected by the defendants' actions were expecting a guilty verdict.

In reviewing a claim of prosecutorial misconduct, this Court first determines whether the prosecutor's remarks were improper and, second, whether they prejudicially affected the substantive

5

rights of the defendant.[11]  Consideration is given to 1) the magnitude of the prejudicial effect of the statements; 2) the efficacy of any cautionary instruction given; and 3) the strength of the evidence of the defendant's guilt.[12]  The magnitude of the prejudicial effect is tested by looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect.[13]  At the same time, the district court's on-the-scene assessment of the prejudicial effect, if any, is entitled to considerable weight.[14]

The defendants cite no Fifth Circuit cases in which this court found a similar argument to be impermissible, but they do cite several cases from other circuits.  First, they cite *United States v. Beasley*,[15] a case in which the Eleventh Circuit held that the prosecutor's references to the "war on drugs" and to the jury as participants in that war were improper.[16]  The court held that those

---

[11]United States v. Lokey, 945 F.2d 825 (5th Cir. 1991); United States v. Carter, 953 F.2d 1449 (5th Cir.), *cert. denied*, 504 U.S. 990 (1992).

[12]*Id.*

[13]United States v. Palmer, 37 F.2d 1080, 1085 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1804 (1995).

[14]*Lokey*, 945 F.2d at 839.

[15]2 F.3d 1551 (11th Cir. 1993), *cert. denied*, 114 S. Ct. 2751 (1994).

[16]The prosecutor made the following improper argument:

I want to say a few words about—and I know you've heard about it and I've heard about it—war on drugs, war on drugs.  You've heard it.  You hear it all the time.  And this is a war.  This is just—this is just another battle in that war.  It's a battle to save folks from being

6

comments were calculated to inflame the jury. However, the Eleventh Circuit refused to reverse the conviction, finding that the comments were not prejudicial to a substantial right of the defendants.

The defendants next cite *United States v. Solivan*,[17] a case involving a prosecutor's argument that the jury should tell the defendant and other drug dealers like her that the people of that community did not want drugs in their area.[18] Those comments suggested that, because of the defendant's participation in the drug trade in northern Kentucky, the drug problem facing the community would continue if the jury did not convict her. The Sixth Circuit reversed, holding that it was improper to urge jurors to convict defendants in order to strike a blow against the drug problem faced by society or within their communities.

The defendants also cite *Unites States v. Johnson*,[19] a case in

---

enslave[d] by crack cocaine. That's what, that's what this battle's about. Now, I've got a place in that war. The judge has got a place. Those defendants over there all have a place in it. . . .

> And for profiteers like [the defendant] to do that to—not just his—not just Esau Street. It's not just Esau Street. It's all over the country. And people, there's another John Christopher out there somewhere. . . .

[17]937 F.2d 1146 (6th Cir. 1991).

[18]The offensive part of the prosecutor's argument was as follows:

> I'm asking you to tell her and all the other drug dealers like her that we don't want that stuff in Northern Kentucky, and that anyone who brings that stuff in Northern Kentucky. . . .

[19]968 F.2d 768 (8th Cir. 1992).

which the Eighth Circuit held that a prosecutorial argument that encumbered the defendant with responsibility for the larger societal problem of drugs in addition to his own misdeeds was improper and inflammatory.[20] Finally, they cite *United States v. Monaghan*,[21] a case in which the D.C. Circuit stated that "[a] prosecutor may not convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking."

This circuit has held that appeals to the jury to act as the conscience of the community are permissible, so long as they are not intended to inflame.[22] This Court upheld as proper the following prosecutor's argument: "You are the arbiters or truth. You are the ones who stand between the citizens of this country and an injustice, crimes that were committed against the nation in which we live."[23] That argument was held to be a mere plea to the jury to do its duty, not an attempt to inflame the jurors. Similarly, this circuit upheld the following argument as proper:

---

[20]The offensive argument went as follows:

[The defendant's attorney] says your decision to uphold the law is very important to his client. Your decision to uphold the law is very important to society. You're the people that stand as a bulwark against the continuation of what Mr. Johnson is doing on the street, putting poison on the street.

[21]741 F.2d 1434 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1085 (1985).

[22]United States v. Ruiz, 987 F.2d 243, 249 (5th Cir.), *cert. denied*, 114 S. Ct. 163 (1993).

[23]*Id.*

"Drugs are a terrible thing and they are ruining the society. . . . And it's up to you to do something about it and that is returning a verdict of guilty on these charges."[24]

The cases cited by defendants are distinguishable. In this case, the prosecution's argument focused on the neighborhood drug problem caused by Ray Fields and his co-defendants. It did not ask the jury to hold the defendants responsible for the national drug problem, but merely to hold the defendants responsible for the drug problem in the neighborhoods in which they sold drugs. Because the prosecution was merely reminding the jurors of the adverse affect that the defendants' activities had upon the particular community in which they sold crack cocaine, rather than encouraging the jurors to convict the defendants because the community expected a conviction, we hold that it was proper.

Further, even if the prosecutor's argument was improper, it would not cast serious doubt upon the verdict. The evidence of the defendants' guilt was overwhelming, so any error would be harmless.

### III.

### DOUBLE JEOPARDY ISSUES

### A.

### THE PRIOR CIVIL FORFEITURES

The government seized approximately $500,000 from the defendants in civil forfeiture actions. Defendants Ray and Timothy Fields, Richardson and Ross moved to dismiss the indictments

---

[24]United States v. Brown, 887 F.2d 537, 542 (5th Cir. 1989).

against them on the ground that these forfeitures constituted punishment, and that the instant prosecution therefore violates the Double Jeopardy Clause. We review this double jeopardy claim de novo,[25] although the district court's factual findings are accepted unless clearly erroneous.[26]

In *United States v. Halper*,[27] the Supreme Court held that a defendant punished in a criminal prosecution cannot be subjected to an additional civil sanction that can fairly be characterized as punishment without violating the Double Jeopardy Clause. Conversely, the logic of *Halper* indicates that a defendant that has been subjected to punishment in the form of a civil forfeiture cannot be subjected to a subsequent criminal prosecution arising out of the same offense. In *Austin v. United States*,[28] the Court held that forfeitures of instrumentalities used in the drug trade, which occur under 21 U.S.C. §§ 881(a)(4) & (a)(7), are *per se* punishments. However, this Circuit has since held that the forfeiture of proceeds from illegal drug sales pursuant to 21 U.S.C. § 881(a)(6) does not constitute punishment.[29] Thus, a prosecution after such forfeitures does not violate the double jeopardy clause.

---

[25]United States v. Whittie, 25 F.3d 250, 255 (5th Cir. 1994).

[26]United States v. Deshaw, 974 F.2d 667, 669 (5th Cir. 1992).

[27]490 U.S. 435 (1989). *See also* United States v. Perez, No. 94-60788, 1995 WL 689385 (5th Cir. Nov. 21, 1995).

[28]113 S. Ct. 2801, 2911-12 (1993).

[29]United States v. Tilley, 18 F.3d 295 (5th Cir.), *cert. denied*, 115 S. Ct. 574 (1994).

10

The district court found that the civil forfeitures in question involved proceeds from illegal drug sales. Because the record does not indicate under which subsection of 21 U.S.C. § 881 the forfeitures were conducted, the district court was forced to determine from the affidavit in support of the forfeitures and from the representations of the parties whether the forfeited property consisted of proceeds or instrumentalities. We review this factual finding for clear error.[30] Our review convinces us that the district court did not err in determining that the forfeited assets consisted of drug proceeds. The affidavit filed in support of the forfeitures alleges that the assets seized were drug proceeds. Further, at the hearing on the motion to dismiss defendants' counsel did not challenge the prosecutor's assertion that the forfeited assets were proceeds. Thus, we accept the district court's findings, and hold that the prior forfeitures do not bar the instant prosecution.

B.

THE CONTINUING CRIMINAL ENTERPRISE CONVICTION

Ray Fields argues that his conviction for conspiracy is barred by double jeopardy because of his conviction for a continuing criminal enterprise. We review this double jeopardy claim de novo.[31]

Count one of the indictment alleged that Ray Fields engaged in

---

[30]United States v. Deshaw, 974 F.2d 667, 669 (5th Cir. 1992).

[31]*Whittie*, 25 F.3d at 255.

11

a continuing criminal enterprise ("C.C.E.") in violation of 21 U.S.C. § 848(a). It alleged that he violated 21 U.S.C. §§ 841(a)(1), 843(b) and 846 as part of a continuing series of crimes undertaken in concert with at least five other persons. Count two of the indictment charged him with the offense of conspiracy. The evidence at trial showed that the C.C.E. alleged in count one was the same enterprise as the conspiracy alleged in count two. Under these circumstances, the conspiracy offense is a lesser included offense of the C.C.E. offense, and the Double Jeopardy Clause prohibits convictions for both offenses.[32] Therefore, we vacate Ray Fields' conviction and sentence under count two.

Although we vacate Ray Fields' conviction on count two, we see no reason to remand this case for resentencing. Where it is clear that the conviction for a lesser included offense did not lead the trial court to impose a harsher sentence on the greater offense than it would have in the absence of the lesser conviction, there is no need to remand for resentencing.[33] Here, the conspiracy conviction clearly did not affect the district court's sentencing on the other offenses. The district court sentenced Ross and Timothy Fields to life imprisonment for their conspiracy offenses. Clearly, it would have sentenced Ray Fields, who was the head of the conspiracy for which Ross and Tim Fields were sentenced, to life in prison for the C.C.E. offense even in the absence of the

---

[32]United States v. Boldin, 772 F.2d 719 (11th Cir. 1985), *cert. denied*, 475 U.S. 1986).

[33]*See* United States v. Michel, 588 F.2d 986, 1001 (5th Cir.), *cert. denied*, 444 U.S. 825 (1979).

12

conspiracy conviction.

## IV.

## SUFFICIENCY OF THE EVIDENCE

### A.

### ROSS & McDONALD'S CONVICTIONS FOR CONSPIRACY

Ross and McDonald claim that the evidence is insufficient to prove beyond a reasonable doubt that one conspiracy—rather than multiple conspiracies—existed, and that they were members of that conspiracy. In reviewing their insufficient evidence claim, we will affirm if, "after viewing the evidence in the light most favorable to the prosecution, [we] find that any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[34]

Whether a single conspiracy or multiple conspiracies existed is a question of fact for the jury to determine.[35] In counting the number of conspiracies, the principal factors are: 1) the existence of a common goal; 2) the nature of the scheme; and 3) overlapping of participants in the various dealings.[36]

As to the first factor, a common goal, a single conspiracy exists where the evidence demonstrates that all of the alleged co-conspirators directed their efforts toward the accomplishment of a

---

[34]Jackson v. Virginia, 443 U.S. 307 (1974).

[35]United States v. Elam, 678 F.2d 1234, 1245 (5th Cir. 1982).

[36]United States v. Richerson, 833 F.2d 1147, 1153 (5th Cir. 1987).

13

single goal.[37]  This factor is satisfied by the common goal of deriving personal gain from the illicit buying and selling of cocaine.[38]  Although Ross contends that he did not have a common goal with the Fields organization, neither Ross nor McDonald argue that they did not share the Fields organization's goal of making money through buying and selling crack cocaine.  Additionally, there is evidence that both McDonald and Ross were involved in the crack cocaine business, which is sufficient to establish this common goal.

The second factor, the nature of the scheme, is also satisfied.  Where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or the overall success of the venture—that is, where there are several parts inherent in a larger common plan—the existence of a single conspiracy will be inferred.[39]  The evidence showed that the activities of one aspect of the scheme were necessary and advantageous to the other aspects of the scheme or to the overall success of the venture, and that there were several parts inherent in a larger common plan.  Specifically, the evidence showed that Ray and Timothy Fields acquired powder cocaine from various sources and converted it into crack cocaine.  Then, through runners the crack cocaine was delivered to distribution "spots" and the money

---

[37]*Id.*

[38]United States v. Morris, 46 F.3d 410, 415 (5th Cir.), *cert. denied*, 115 S. Ct. 2595 (1995).

[39]*Richerson*, 833 F.2d at 1154.

14

was returned to the Fields brothers. Ray Fields hired and fired personnel and supervised the overall operation. The supply system was necessary to Ross, who was in charge of the "spot" at the car wash on Second Street. McDonald, as one of the runners delivering drugs and money for Ray Fields, also played a necessary role in the venture. Thus, the nature of the scheme showed a single conspiracy.

The "overlapping of participants" factor also indicates that a single conspiracy existed. There is circumstantial evidence that Ross worked for Ray Fields, the pivotal figure in the conspiracy. The evidence also showed that Ray Fields also worked with other members of the conspiracy, and that McDonald delivered drugs to members of the conspiracy. All in all, the evidence is sufficient to support the jury's finding of a single conspiracy with overlapping participants, which revolved around Ray Fields.

B.

ROSS' CONVICTION FOR MONEY LAUNDERING

Ross also argues that the evidence is insufficient to support his conviction for money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Ross was convicted of money laundering based on his purchase of a pickup truck with $20,000 in drug proceeds in a transaction that was designed to conceal the nature of his unlawful activity. To convict a defendant under 18 U.S.C. § 1956(a)(1)(B)(i), the government must show that the defendant: (1) conducted a financial transaction; (2) which he knew involved the

15

proceeds of an unlawful activity; (3) with the intent to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity.

Our review of the evidence leaves us satisfied that the evidence is sufficient to affirm Ross' money laundering conviction. Ross does not dispute the first element; he admits that he purchased a truck, which constituted a financial transaction. As for the second element, there is circumstantial evidence that supports the jury's finding that he knowingly purchased the truck with drug money. Specifically, Ross paid for the truck with a paper sack full of cash, and the payment took place at the game room, a location where cash from crack cocaine sales was brought in and turned over to Ross. Finally, Ross' registration of the truck in his brother's name is sufficient to show an intent to conceal.

## C.

### ROSS' FELON IN POSSESSION OF A FIREARM CONVICTION

Ross contends that the evidence was insufficient to support his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Two firearms were found during a search of a house located at 1347 Glencliff Circle. During that search, officers found a handgun underneath a mattress and a shotgun leaning against a wall next to a safe.[40] To convict

---

[40]The parties dispute whether the gun was in or next to the safe. However, Government's Exhibit 16.4 clearly shows that the shotgun was too long to fit in the safe. Therefore, it must have been next to the safe.

16

Ross under Section 922(g)(1), the government must prove: (1) that Ross was a convicted felon; (2) who possessed a firearm; and (3) that the firearm was in or affected commerce. While Ross admits to being a felon, he contends that the government failed to prove that he possessed a firearm, or that the firearm was in interstate commerce. Our review of the evidence, however, leads us to conclude that the evidence is sufficient to affirm the conviction.

The expert testimony of Agent Frost established the interstate commerce element. Frost testified that the firearms were manufactured outside of Texas and traveled in interstate commerce to reach Texas. This testimony is sufficient to satisfy the commerce element of Section 922(g)(1).

There is also sufficient evidence to support the jury's finding that Ross possessed a firearm. Although the evidence seems insufficient to show that Ross possessed the handgun, it is sufficient to show that he constructively possessed the shotgun. Constructive possession is defined as "ownership, dominion or control over the [shotgun] itself or dominion or control over the premises in which the [shotgun] is concealed."[41] However, where two or more persons jointly occupy the place where a firearm is found, mere control or dominion of that place is, by itself, insufficient to establish constructive possession.[42] Evidence showing at least a plausible inference that the defendant had knowledge of and

---

[41]United States v. Mergerson, 4 F.3d 337, 349 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1310 (1994).

[42]*Id.*

17

access to the weapon is necessary to establish constructive possession.[43] Because Ross jointly occupied the house with his wife,[44] the prosecution must show that Ross had access to and knowledge of the weapons. While there does not seem to be any evidence which shows that Ross had access to or knowledge of the handgun, the fact that the shotgun was found in plain view, leaning against a wall, is sufficient to establish that he had knowledge of and access to the shotgun. Therefore, we affirm his Section 922(g)(1) conviction.

## V.

### ROSS AND RAY FIELDS' MOTIONS TO SUPPRESS

### A.

### ROSS' MOTION TO SUPPRESS

Ross moved to suppress evidence that was seized at the time of his arrest; namely, $28,000 and a pistol. He was arrested during a routine traffic stop. On February 27, 1991, officer Steve Oulliber observed Ross driving a red Mustang. Ross, who was stopped at a traffic light, saw the officer and put on his seatbelt. The officer then stopped Ross for a seatbelt violation. The officer then discovered that Ross' driver's license was invalid because he had not updated the address on the license, and that Ross did not have proof of insurance. The officer then arrested

---

[43]*Id.*

[44]Although Ross presented evidence that he did not live at the home at the time of the search because he was having problems with his wife, the jury was free to disbelieve such evidence.

18

Ross and had the Mustang impounded. He then conducted an inventory search of the vehicle, and discovered the pistol and the $28,000.

In our review of the district court's denial of the motion to suppress, the district court's factual findings are accepted unless clearly erroneous or influenced by an incorrect view of the law, while questions of law are reviewed de novo.[45] Although he concedes that inventory searches are valid when conducted pursuant to standard procedures, Ross contends that the inventory search was an unlawful pretext search. That is, he claims that the officer stopped Ross simply to find an excuse to search his car. However, this circuit has held that pretext searches do not violate the Fourth Amendment.[46] "[S]o long as the police do no more than they are objectively authorized and permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry."[47] Thus, Ross' pretext search argument is without merit.

Ross also contends that the search was illegal because the prosecution failed to present evidence that the Dallas Police Department had a standard inventory search procedure. However, Ross did not present this argument before the district court in his motion to suppress. In fact, during the hearing on the motion to suppress, his counsel admitted, "If [the police officer] makes a

---

[45]United States v. Capote-Capote, 946 F.2d 1100, 1102 (5th Cir. 1991), *cert. denied*, 504 U.S. 942 (1992).

[46]United States v. Shabazz, 993 F.2d 431, 435 n. 3 (5th Cir. 1993); United States v. Causey, 834 F.2d 1179, 1184 (5th Cir. 1987)(en banc).

[47]*Causey*, 834 F.2d at 1184.

valid arrest, he has the ability to conduct an inventory search."[48] Thus, our review is limited to plain error.[49]  Because the police officer's testimony implied that the Dallas Police Department had a policy of conducting inventory searches when it impounded cars,[50] we find no such error.

B.

ROSS' MOTION TO SUPPRESS EVIDENCE OF<br>STATEMENT MADE WHILE IN POLICE CUSTODY

Ross contends that the district court erred in refusing to suppress a statement that he made during police custody.  He claims that the statement should have been suppressed because he did not intelligently waive his right to an attorney before making it.  The district court's determination that Ross' waiver was knowing and intelligent is a finding of fact, which we review only for clear error.[51]

After Ross was arrested on April 22, 1993, he was taken to a DEA office.  At the DEA office, he was given *Miranda* warnings.  After he was given the warnings, IRS agent De Los Santos advised him why he had been arrested.  Ross responded by saying, "I'm

---

[48]R. 25:161.

[49]United States v. Caverly, 37 F.3d 160, 162 (5th Cir. 1994)(en banc), *cert. denied*, 115 S. Ct. 1266 (1995).

[50]Officer Oulliber testified that "99 out of 100 times [the inventory search is] done right on the street."  This testimony implied that the Dallas Police Department had a policy of conducting inventory searches on impounded cars.

[51]United States v. Rocha, 916 F.2d 219, 229 (5th Cir. 1990), *cert. denied*, 115 S. Ct. 346 (1994).

guilty of whatever you say." He then said that he would not tell the officers anything about Ray Fields. A few minutes later, he mentioned that he had spoken to an attorney regarding the matter. At that point, the officers stopped the interrogation.

Ross claims that his waiver of his right to an attorney was not knowing and intelligent because a person who intelligently waived his right to counsel would not request counsel a few minutes later. Ross cites no cases in which a request for counsel made subsequent to making an incriminating statement was held to constitute an unknowing and unintelligent waiver. We hold that Ross' waiver was intelligent and knowing. Although Ross' waiver may have been unwise, assuming that he planned to plead not guilty, he simply fails to show that he did not understand that he had a right to counsel. Because there was evidence that Ross understood his *Miranda* rights, the district court did not err in finding that he waived them. Therefore, we affirm the district court's denial of Ross' motion to suppress.

## C.

### RAY FIELDS' MOTION TO SUPPRESS

Ray Fields seeks to suppress evidence seized during a search of a home at 4829 Cedardale. This search was conducted pursuant to a search warrant. Ray Fields contends that the evidence seized during that search—weapons and $245,000 in small bills—should be excluded because the affidavit upon which the search warrant was granted did not provide adequate probable cause.

21

In reviewing the denial of a motion to suppress evidence obtained pursuant to a warrant, this Court engages in a two-step review. First, it determines whether the good-faith reliance on a warrant exception to the exclusionary rule applies.[52] Evidence obtained by officers in objectively reasonable good-faith reliance upon a defective search warrant is admissible unless the affidavit upon which the warrant was issued is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.[53] Second, if the good-faith reliance exception does not apply, this Court determines whether probable cause supported the warrant.[54]

The reasonableness of an officer's reliance on a warrant issued by a magistrate is reviewed *de novo*.[55] When a warrant is supported by more than a "bare bones" affidavit, officers may rely in good faith on the warrant's validity.[56] Bare bones affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.[57] Ray Fields argues that the affidavit merely contained conclusory statements, and was thus a bare bones

---

[52]United States v. Satterwhite, 980 F.2d 317, 320 (5th Cir. 1992).

[53]*Id.*

[54]*Id.*

[55]*Id.* at 321.

[56]*Id.*

[57]*Id.*

affidavit. Further, he argues that the officers' reliance on the affidavit was unreasonable because the affidavit is based on information provided by confidential informants, and did not establish the credibility of those informants.

Our review of the affidavit convinces us that, while the affidavit did contain some conclusory statements, taken as a whole it established probable cause. It set forth the background and experience of the affiant in law enforcement. Further, the credibility of the confidential informants was established by other information in the affidavit. The information given by the informants was detailed, including names, address, amounts of money and the roles of various persons. The confidential informants also implicated themselves in illegal drug activities and made admissions against penal interest. Each informant gave information to the police independent of the other informants, and each one's information corroborate the others'. Further, a police investigation corroborated some of the evidence provided by the informants. Thus, we hold that the affidavit was more than a bare bones affidavit, and that the officers reasonably relied upon it in searching the house.

Ray Fields also claims that the affidavit fails to establish a nexus between the illegal activity and the home that was searched. Ray Fields claims that all the affidavit stated in this regard was that, in the affiant's experience in law enforcement, criminals keep evidence of crime in their home. The government notes that the affidavits stated that Ray Fields would stay at the

home when things "got hot for him," that law enforcement surveillance confirmed that the Fields drug organization held meetings at the home, and that members of the organization called the home on several occasions. While this does not constitute conclusive evidence that evidence was in the home, it does seem to be enough evidence to be reasonably relied upon by the police in executing a search warrant. Thus, we affirm the district court's denial of Ray Fields' motion to suppress.

VI.

McDONALD'S MOTION FOR SEVERANCE

McDonald contends that he was entitled to severance under Federal Rule of Criminal Procedure 14, which allows severance when a defendant is prejudiced by joinder of offenses or defendants.[58] We review the district court's denial of his motion for severance due to prejudicial joinder for abuse of discretion.[59]

McDonald contends that he was entitled to severance because there was a qualitative disparity between the evidence against him and the evidence against the other defendants. Specifically, the evidence showed that Ray Fields and Ross had been major players in

---

[58]FED. R. CRIM. P. 14 provides—

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of the counts, grant a severance of defendants or provide whatever other relief justice requires. . . .

[59]*Capote-Capote*, 946 F.2d at 1104.

24

the drug business for years, while McDonald was only a runner who recently joined the Fields organization. He also argues that the evidence against Ray Fields and Ross was so pervasive that it must have prejudiced him, notwithstanding the instructions given by the district court.

In conspiracy cases, the general rule is that persons indicted together should be tried together.[60] A defendant can only obtain a reversal for failure to sever if he can demonstrate "compelling prejudice against which the trial court was unable to afford protection."[61] McDonald has not demonstrated such compelling prejudice. This Court has held that neither a disparity in the amount of evidence against each defendant nor a supposition that the evidence against other defendants "spilled over" and prejudiced the defendant constitute compelling prejudice.[62] The fact that McDonald was only a minimal participant in the Fields organization likewise does not mandate reversal.[63] Further, the district court seems to have remedied any prejudicial effect by instructing the jury to limit its consideration of the evidence to the appropriate defendant.

VII.

---

[60]United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir. 1993).

[61]*Id.*

[62]*Id.;* United States v. Harrelson, 754 F.2d 1153, 1175 (5th Cir. 1985), *cert. denied*, 474 U.S. 908 (1985).

[63]United States v. Rocha, 916 F.2d 219, 229 (5th Cir. 1990), *cert. denied*, 500 U.S. 934 (1991).

SENTENCING ISSUES

McDonald, Richardson and Ross argue that the district court did not properly apply the Sentencing Guidelines. In reviewing sentencings, we review findings of fact made by the district court for clear error.[64] We review the district court's application of the Sentencing Guidelines de novo.[65]

A.

McDONALD'S CLAIMS

McDonald claims that the district court did not determine the drug quantity that was within the scope of his conspiratorial agreement with the Fields organization, or what part of that quantity was reasonably foreseeable by McDonald. In *United States v. Correon*,[66] this Court held that, in sentencing a defendant for participation in a drug conspiracy, a trial court must make three findings: 1) when the defendant joined the conspiracy; 2) what drug quantities were within the conspiracy; and 3) of these drug quantities, which were reasonably foreseeable by the defendant. McDonald claims that, in finding that he was responsible for 120 kilograms of crack cocaine, the district court failed to make the second and third findings. Therefore, he argues, he may have been sentenced for drug sales outside of the scope of the conspiracy

---

[64]United States v. Barbontin, 917 F.2d 1494, 1497 (5th Cir. 1990).

[65]*Id.*

[66]11 F.3d 1225, 1236 (5th Cir. 1994).

26

into which he entered.

However, these findings can either be found in the presentence report (which was adopted by the district court at sentencing), or can be implied from the district court's findings.[67] The presentence report states that McDonald was personally involved in the redistribution of approximately 120 kilograms of crack cocaine in the course of making payroll deliveries and distributing drugs to approximately three locations. If McDonald was personally involved in the redistribution of approximately 120 kilograms of crack cocaine, then that amount was clearly within the scope of the conspiracy into which he entered, and was clearly foreseeable to him. Accordingly, McDonald's sentence is affirmed.

B.

RICHARDSON'S CLAIMS

Richardson challenges his sentence on several grounds. First, he notes that the guidelines changed the base level for his offense from forty-two to thirty-eight by an amendment that went into effect eight months after he was sentenced. He claims that the failure to apply the reduced level to him imposed an "ex post facto type" result on him. A defendant's sentence is normally based on the Guidelines "that are in effect on the date that the defendant

---

[67]*See* United States v. Puig-Infante, 19 F.3d 929, 943 (5th Cir.), *cert. denied*, 115 S. Ct. 180 (1994)(a court can make implicit findings as to contested facts so long as the reviewing court is not left to second-guess the basis for the sentencing decision).

is sentenced."[68]  However, amendments that are enacted after a defendant's offense but before sentencing are not applied when doing so would increase the sentence, because applying them in such a situation would violate the Ex Post Facto Clause of the Constitution.[69]  Richardson tries to turn the Ex Post Facto Clause on its head by arguing that it requires this Court to apply amendments taking effect subsequent to sentencing when those amendments would decrease a defendant's sentence.  Richardson does not cite any authority in support of this argument.  This lack of authority is hardly surprising, because his argument is without merit.  The Ex Post Facto clause prohibits Congress from imposing a harsher penalty upon someone after he commits a crime; it does not require Congress to retroactively reduce penalties.

Richardson next argues that the guidelines are inconsistent with 18 U.S.C. §§ 3553(a) and 3661.  These statutes govern the factors that a district court should consider in sentencing a defendant.  This is an issue of first impression in our circuit, but has been addressed by the Sixth and Ninth Circuits.[70]  Those circuits found that Sections 3553(a) and 3661 are not inconsistent with the guidelines, but rather set out factors that courts should consider when sentencing within the guidelines.  We find the

---

[68]18 U.S.C. § 3553(a)(4); U.S.S.G. § 1B1.11(a).

[69]United States v. Suarez, 911 F.2d 1016, 1021-22 (5th Cir. 1990).

[70]*See* United States v. Davern, 970 F.2d 1490, 1492 (6th Cir. 1992)(en banc), *cert. denied*, 113 S. Ct. 1289 (1993); United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991).

position of the Sixth and Ninth circuits to be well-reasoned, and hold that the guidelines are not inconsistent with Sections 3553(a) and 3661.

Richardson next argues that there is insufficient evidence to support the district court's finding that he was responsible for 100 kilograms for crack cocaine and 125 kilograms of powder cocaine. He also claims that the district court held him responsible for drugs distributed by the conspiracy prior to his joining. Our review of the record, however, convinces us that the evidence supports the district court's findings. The district court found that Richardson joined the conspiracy in the summer of 1989, and was responsible for 100 kilograms of crack cocaine. The district court also attributed half of the crack cocaine sold at the car wash—a total of 84 kilograms—to Richardson. It was apparent that these quantities were based on Richardson's sales while a part of the conspiracy. For example, there was testimony that Richardson delivered money from the car wash to the game room for the Fields organization. This testimony is sufficient to support a finding that the crack cocaine sold at the car wash was within the scope of the conspiracy into which Richardson entered. Further, the fact that the district court only attributed half of the cocaine sold at the car wash to Richardson indicates that only the amount of drugs sold subsequent to his entering into the conspiracy was considered for sentencing purposes.

Finally, Richardson argues that the 1994 amendment to U.S.S.G. § 2D1.1, which reduced the maximum level for the offenses committed

29

by Richardson to thirty-eight, should be applied retroactively. However, the amendment did not go into effect until after Richardson was sentenced, and was not included as subject to retroactive application under U.S.S.G. § 1B1.10. Therefore, it is not retroactive.

Finding no error in Richardson's sentencing, we affirm his sentence.

C.

ROSS' CLAIMS

Ross argues that the district court erred in setting his base offense level at forty-two. The district court imposed the base offense level at forty-two because it found that Ross' offense involved more than fifteen kilograms of crack cocaine.[71] This finding was a factual one, which we review only for clear error. Our review of the record convinces us that the district court did not err. Ross was involved as a high-level, supervisory member of the Ray Fields conspiracy for several years. This conspiracy resulted in the sale of more than 1,000 kilograms of crack cocaine. Thus, the district court was justified in finding that Ross' offense involved more that fifteen kilograms.

Finding no error in Ross' sentencing, we affirm Ross' sentence.

IX.

---

[71]*See* U.S.S.G. § 2D1.1(c)(1).

## CONCLUSION

We VACATE Ray Fields' conviction on count two (conspiracy), and AFFIRM the district court in all other respects.

VACATED IN PART AND AFFIRMED IN PART.